# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 04-2799

_____

Talisa D. Pool,          *

                   *

        Appellee,      *

                   *      Appeal from the United States

    v.                   *      District Court for the

                   *      Western District of Arkansas.

Sebastian County, Arkansas;      *

Sebastian County Sheriff's Office;   *

Frank Atkinson, Sheriff; Jim Rush;   *

Donna Seamster; Charles Wall;    *

Gayla Grist; Matt Brown; John and   *

Jane Does, 1-5,            *

                   *

        Appellants.     *

_____

Submitted: March 18, 2005

Filed: August 18, 2005 (Corrected August 26, 2005)

_____

Before RILEY, BOWMAN, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Talisa Pool suffered a miscarriage at the Sebastian County Detention Center ("SCDC") while awaiting transfer to the Arkansas Department of Corrections. Pool filed suit against the following defendants: Sebastian County, Arkansas; the Sebastian County Sheriff's Office; Frank Atkinson, the Sheriff of Sebastian County,

Arkansas; Jim Rush, a jail administrator; Donna Seamster, a licensed practical nurse; Charles Wall, a registered nurse; Lt. Gayla Grist; Deputy Matt Brown; and various John and Jane Doe jailers.

Pool alleged four claims in her complaint: (1) a claim under 42 U.S.C. § 1983 and Arkansas law that the defendants were deliberately indifferent to her serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment; (2) a claim under the Arkansas Civil Rights Act based on a provision of the Arkansas Constitution that states: "The policy of Arkansas is to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution."; (3) a claim under Arkansas law for the tort of outrage; and (4) a claim under Arkansas law against Seamster and Wall for medical injury due to negligence.

The defendants filed a motion for summary judgment. The district court[1] granted the defendants' motion for summary judgment on claims (2) and (4) above. In addition, the district court granted summary judgment to defendant Matt Brown on all claims because he was not employed at the SCDC at the time of the incident. However, the district court denied summary judgment to all of the other defendants on the § 1983 claim, holding that genuine issues of material fact exist as to whether the defendants were deliberately indifferent and that the defendants are not entitled qualified immunity.

The remaining defendants ("Appellants") now bring this interlocutory appeal from the district court's denial of their motion for summary judgment based on qualified immunity. Ordinarily, a party cannot appeal from a denial of summary

---

[1]The Honorable Beverly Stites Jones, United States Magistrate Judge for the Western District of Arkansas.

judgment. *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001). However, "government officials who lose their motions for summary judgment on the basis of qualified immunity are . . . entitled to an immediate review solely to determine whether the plaintiff's claims allege a violation of clearly established law." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1046 (8th Cir. 1989). Therefore, the only issue on appeal is whether the district court erred in denying Appellants' motion for summary judgment on the § 1983 claim based on qualified immunity. For the reasons discussed below, we dismiss for lack of jurisdiction in part, and we affirm in part.

## I. FACTUAL BACKGROUND

We adopt in large part the statement of facts in the district court's memorandum opinion. *See Talisa D. Pool v. Sebastian County, Ark.*, No. 03-2112, slip op. at 2-16 (W.D. Ark. June 28, 2004). The following facts are drawn from Pool's deposition testimony and written records maintained by the SCDC.

Following a jury trial, Pool was convicted of manslaughter and sentenced to ten years in prison. The Arkansas Court of Appeals affirmed her conviction and sentence. While out on bond pending her appeal, Pool learned she was pregnant by taking a home pregnancy test. Pool believed she was a couple of months pregnant. She called the Health Department and made an appointment for prenatal care. However, before the appointment, Pool turned herself in to begin serving her sentence.

On May 8, 2001, she was booked into the SCDC pending transfer to the Arkansas Department of Corrections. Earlier that day, Pool realized she was bleeding. When she went to the bathroom, she noticed light blood in the commode and put on a sanitary pad. When Pool turned herself into the SCDC, she was not visibly pregnant at the time. However, as part of the booking-in process, she completed a medical questionnaire on which she indicated that she was currently

pregnant. The questionnaire contained the following question: "Is there anything else we need to know about your health?" In response, Pool wrote: "I am passing blood clots." Pool also asked if she could be seen by a nurse. She was told that she would have to fill out a form for money to be deducted from her account. Pool stated that she had no problem with that and just needed to see the nurse. Pool completed the form.

A medical treatment report dated May 8, 2001 and completed by Donna Seamster, a licensed practical nurse, indicates that Pool stated she was pregnant and bleeding. It was noted that Pool was demanding transportation to the emergency room. Seamster indicated that Pool was instructed to rest with her feet elevated.

Although the May 8 report contains a line indicating that Pool had been "seen by" Seamster, Pool maintains that she was not seen until the following day at about 8:00 a.m. or 9:00 a.m. According to Pool, the nurse was "real rude." The nurse asked Pool if she was pregnant and when Pool responded "yes," the nurse asked how she knew she was pregnant. Pool responded that she had taken a home pregnancy test. The nurse also asked Pool why she thought she needed to go to the emergency room. Pool responded that she had started hemorrhaging on her way to the jail and had put on a sanitary pad. Pool asked the nurse for some Tylenol and pads, but the nurse responded that she just needed bed rest. According to Pool, the nurse did not believe she was pregnant.

Seamster's medical treatment report dated May 9, 2001 states that according to a twenty-hour activity log, Pool had not asked for sanitary pads. It also notes that Pool had been observed standing in the recreation yard and visiting with her peers. The report indicates that Pool had been served three meals without difficulty or complaint and that no blood was observed in the commode.

After her visit to the nurse, Pool returned to her cell and lay down. She stayed in her bed all day, slept, and held her belly because of cramping in her abdominal area. When meals came, some of the other female inmates brought her tray to her. Again, she requested Tylenol and pads, but she was told that they were out of both. Throughout the day, she continued to ask for Tylenol and pads but never received any.

Finally, after a shift change, one of the other inmates was able to get her some pads. Fellow inmates took a pad containing blood clots to one of the deputies who was supposed to show it to the nurse on duty. Despite this, no one came to check on her or asked how she was doing.

Pool ached and continued to pass blood clots and overflow her sanitary pads. She rested with her feet up and slept in her clothes. According to Pool, she felt so bad while she was in the SCDC that she did not shower or go to the recreation yard.

On May 11, 2001, Pool was told to pack up her things because she was going to be taken to Benton County. Pool put on her street clothes. During the drive she was cramping and dozed in and out. By the time she got to Benton County, Pool had bled through her clothes and onto the seat of the bus. One of the male inmates told Pool she had blood on her clothes.

During the booking-in process at Benton County, Pool asked if she could be seen by the nurse. The booking officer asked what was wrong and Pool replied that she was pregnant and bleeding. When the booking officer saw her clothes, Pool was immediately taken to see the nurse. The nurse asked Pool to take off her clothes. Noticing that blood had overflowed the pad and through Pool's clothes, the nurse asked why she hadn't been taken to the doctor or hospital. Pool responded that she didn't know and that she had been bleeding like this for a couple of days. Pool asked the nurse if she could get her to the hospital because she felt like she was going to

lose her baby. The nurse replied that she would see what she could do. Pool testified that she was passing quarter-sized blood clots during this time.

Pool was told to shower and to put on a Benton County jail uniform. She also was given some pads. However, about an hour later, Pool was told that she was going to be taken back to the SCDC and that she needed to pack up her things. Pool changed back into her bloody clothes.

A medical treatment report completed by Charles Wall, a registered nurse, indicates that Pool was returning to the SCDC from Benton County. Wall directed that Pool be placed in an observation cell, that her pad usage and bleeding be noted, and that she be encouraged to rest. He wrote that "we will observe pt. for alleged bleeding though been unable to affirm."

When Pool returned to the SCDC, she put on a uniform and was placed in an observation cell. She was told that the doctor would see her that night. The cell had a small window in the door that was kept covered from the outside. According to Pool, the observation window was opened only once while she was in the cell. When the door was opened to push in her meal tray, Pool asked the female deputy if or when she was going to see the doctor. She was told that the doctor had been checking on her throughout the night. Pool responded that she hadn't spoken to the doctor.

Pool could not eat, was cramping badly and bleeding. According to Pool, on the second day in the observation cell, "everything just started going crazy." Pool was in such pain she was balled up in a knot. She only got up from the bed when she had to use the commode. She was screaming, hollering and beating on the wall to try to get the deputies to come and see her.

When the deputies came, she told them she had bled in her clothes and that she needed to see the doctor. According to Pool, the deputies did not enter the cell but

only stood at the open door. They told her that there were no doctors, that they could not see any blood, and that there was nothing wrong with her and she just needed to lie down and put her feet back up. The entire time she was in the observation cell, no one actually entered the cell until after she miscarried.

Sometime shortly after midnight on May 13, 2001, Pool miscarried over the commode. Pool caught the baby with her shirt. According to Pool, the deputies did not believe that she was pregnant and that she had miscarried.

A jailer came to the observation window when Pool had the baby in her lap. The jailer asked Pool to hold up the baby. Pool responded that she could not because the cord was still attached. The jailer then left and returned with Deputy Griffin and another deputy. They asked: "Is a child really there?" Pool responded yes and the deputies left. The paramedics came to transport Pool to the hospital.

Pool was taken to the hospital and underwent surgery to remove the placenta. The fetus was determined to have been between four and five months in gestation. Hospital records do not mention that Pool had been bleeding for several days prior to arriving at the hospital. In fact, the records indicate that Pool went to jail that day and delivered a pre-term non-viable infant.

Deputy Griffin was working the control room on the night Pool miscarried. Deputy Griffin submitted an affidavit, in which she attests to the following facts. She was aware that Pool had been bleeding daily prior to miscarrying. Two days before Pool miscarried, Deputy Griffin delivered a used sanitary pad to her supervisor and was told to get it off the desk. Deputy Griffin's supervisor told her to quit being an inmate-lover, to toughen up and to "not let these people get to you." The supervisor also commented: "F[***] her [Pool], she's going to prison and doesn't need a baby anyway." Deputy Griffin also maintains that everyone on her shift was aware of what

was happening to Pool because they had talked about it. Finally, Sgt. Grist told Deputy Griffin not to do anything for Pool and that Pool just wanted attention.

Deputy Griffin maintains that after Pool miscarried, there was blood all over the cell floor and bench, and Pool was sitting in a pool of blood crying. Deputy Griffin wrote the following report on May 13, 2001 at 5:43 a.m.:

> At approximately 1:00 a.m. while working control room I saw inmate Pool rocking back and forth on the bunk holding her stomach. I turned on the speaker and ask inmate if she was OK. She was yelling "Help me." I told Sgt. Grist. Grist said she would check on her shortly. At approximately 1:25 Sgt. Grist and Deputy Brown entered cell. Inmate stated she was miscarrying and was sitting in water. Deputy Brown told inmate to put her feet up. Inmate did not comply, Grist and Brown exited cell. At approximately 1:30 a.m. inmate moved to toilet and sat down still yelling for help. Inmate then stood and had a white piece of material in her hand under her bottom. She then moved back to bunk with something in her hand. I had Deputy Warren take over control so I/Griffin could go to cell. I opened window and ask what she had. She said she was holding her baby. I immediately found Sgt. Grist and she returned to cell with myself along with Deputy Brown. We entered cell and saw a small fetus in her lap. Deputy Brown wanted to remove it but inmate said no it was still attached by the cord. Inmate then stated "Are you happy now." Sgt. Grist contacted Nurse Charlie and E.M.S. E.M.S. arrived at approximately 1:48 a.m. and departed at approximately 1:53 a.m.

On May 14, 2001, Deputy Griffin also wrote the following incident report:

> Due to being tired and stressed I forgot details about this incident that I wanted to include. They are as follows: At approximately 1:30 a.m. when inmate Pool moved to the toilet and sat down she was as I said still yelling for help. She then proceeded to scream continuously and then tried to stand. After a few brief moments she began looking downward and yelled "no" then reached her right hand under her. Then she

-8-

reached down and picked up some sort of white materials and brought it up under her bottom. She stood there for a moment before moving to the bunk where she sat with her left leg bent on the bunk and her right foot on the floor. She still had this white material in her hand and it appeared there was something in it. After being relieved by Deputy Warren to go check on inmate Pool I opened the window to the cell and tried to get her to come to the door. She stated that she couldn't get up. I tried again to get her to come to the door and again she declined. I then ask [sic] her what she had in the white material she said "It's my baby" and began to cry. Inmate then said "I told you, do you believe me now?" I then went to find Sgt. Grist. Report continues as earlier reported.

On May 14, 2001, Lt. Gayla Grist wrote the following incident report:

At approximately 1:25 a.m. on May 13, 01 myself and Deputy Brown checked on Talisa Pool due to her yelling for a few minutes. Pool said she thought she was trying to have a miscarriage. I asked her how far along she was in her pregnancy and she said four months. A small amount of blood was on the stool so I told her the best thing to do was to lie on her back and elevate her feet. She would not do what I asked and remained in a position on her knees and squatted down. At approximately 0135 Deputy Griffin notified me that she saw Pool deliver the baby and had it in her hands. Myself and Brown went to the hospital cell where Pool did have a fetus approximately four to five inches long. I went to the office and called Nurse Wall to advise him of the transport of Pool to the hospital. At approximately 0142 EMS was contacted. They arrived at 0148 and departed with Pool and Deputy Brown as escort at 0153. She was taken to Sparks Hospital for evaluation.

On May 14, 2001, Deputy Brown wrote the following report:

On 5/12/01 at approximately 2345 I heard screams coming from HC-3 and opened the window where inmate Pool was being housed. Pool stated that she was cramping. I told her that there wasn't anything I

could do for her cramping but that I would keep a check on her. Approximately 0125 myself and Sgt. Grist went down to check on Pool because she had started to yell again. When we entered the cell Pool stated she was having contractions that were four minutes apart. Pool said she was bleeding and she thought she was going to miscarry. Pool told Sgt. Grist that she was about four months along. Pool was told to try to relax and lie down with her feet propped up. I noticed a small amount of blood in the toilet but did not see that she had any coming from between her legs. While I was talking to Pool she no longer acted like she was in pain. She said she couldn't lie down because her mat was wet. The mat or her blanket did not appear to be wet. A few minutes later while I was intaking another inmate Sgt. Grist told me to come with her that Pool might have had the baby. When we entered the cell there was a small brown object between Pool's legs. I approached her and saw that it was a baby. I picked up the baby to check for any signs of life but there weren't any. Pool told me not to take it because it was still attached to her. (The placenta was still inside her). Sgt. Grist exited the cell to contact EMS and I stayed with Pool until EMS arrived. After their arrival I escorted Pool to the hospital. It was confirmed that the fetus had not survived and the doctor tried to remove the placenta. Pool asked for something for the pain and it seemed as if she was only in pain when the doctors and nurses were around. Pool was given a shot for pain and the doctor was unsuccessful removing the placenta and Pool was given medication to assist her body with expelling the placenta. A few hours later Pool again asked for more pain medication.

On May 17, 2001, the jail administrator, Jim Rush, wrote to the supervisor of the Criminal Investigation Division about why Pool was in the observation cell. Rush wrote:

The reason Ms. Pool was in the Observation Cell under constant video surveillance was because upon learning that Ms. Pool was refused transfer to Benton County due to medical problems and upon learning that ADC [Arkansas Department of Correction] would accept custody on Monday, May 14, 2001 of Ms. Pool, I advised Nurse Wall for Ms. Pool to be placed in the Observation Cell immediately upon her return

from Benton County for medical observation until her departure to the ADC on Monday, May 14, 2001.

Appellants submitted to the district court an affidavit of Dr. Mike Hillis. In May 2001, Dr. Hillis was a resident at Sparks Regional Medical Center. He was present when Pool was brought in following her miscarriage. Dr. Hillis stated that there was nothing in Pool's medical history, including a previous vaginal delivery and a full-term caesarean section, to indicate that Pool was subject to any special or additional risk of miscarriage. In fact, Dr. Hillis stated that previous successful deliveries indicate Pool had a lower risk of miscarriage.

Dr. Hillis further stated that the pathologist's report indicates Pool's miscarriage was probably caused by an abrupted placenta, which occurs when the blood flow to the placenta ceases. Dr. Hillis explained that an abrupted placenta can be caused by the use or abuse of amphetamines; however, no drug screen was performed in Pool's case. Dr. Hillis stated that because Pool's miscarriage appears to have been caused by an abrupted placenta, the fetus was "almost surely dead before the miscarriage occurred." Dr. Hillis's affidavit provided that a "miscarriage is not a physical injury; instead, it is a natural body function whereby the body rejects the fetus and results in no physical harm to the patient." Finally, he stated that "[t]he only thing to do for a woman who appears likely to have a miscarriage is to advise bed rest with elevation of the feet" and that "bed rest . . . is the only advice or treatment I would give a patient I suspect might have a miscarriage."

## II.    DISCUSSION

Qualified immunity protects a government official from liability in a § 1983 claim unless his or her conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Meloy v. Bachmeier*, 302 F.3d 845, 848 (8th Cir. 2002). At the time of Pool's miscarriage, "the

law was clearly established that a prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) and *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)). "Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." *Meloy*, 302 F.3d at 849. "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly*, 205 F.3d at 1096 (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)) (internal quotation omitted). However, "medical treatment may so deviate from the applicable standard of care as to evidence . . . deliberate indifference." *Moore*, 255 F.3d at 545.

In this interlocutory appeal, Appellants argue that they are entitled to qualified immunity because: (1) Pool offered no proof that they proximately caused any compensatory damages; (2) Pool suffered no physical injury;[2] (3) they complied with the standard of medical care in the community in treating Pool; and (4) Pool cannot prove that she was suffering from a serious medical need that created an excessive risk to her health or safety or that Appellants actually knew of an excessive risk.

We must first address whether we have jurisdiction over this appeal. As we noted, ordinarily we lack jurisdiction over an appeal challenging the denial of a summary judgment motion, but when a summary judgment motion based on qualified immunity is denied, we have jurisdiction to "resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity." *Id.* (quoting *Behrens v. Pelletier*, 516

---

[2]Essentially, this presents an issue of damages under the Prison Litigation Reform Act of 1996, 42 U.S.C. § 1997e(e), which provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

U.S. 299, 313 (1996)) (internal quotations omitted). "A district court's determination of evidentiary sufficiency is not subject to an interlocutory appeal, however, simply because the determination occurs in a qualified immunity case." *Id.* In sum, in an interlocutory appeal:

> The question of what was known to a person who might be shielded by qualified immunity is reviewable, to determine if the known facts would inform a reasonable actor that his actions violate an established legal standard . . . . Conversely, if the issues relate to whether the actor actually committed the act of which he is accused, or damages, or causation, or other similar matters that the plaintiff must prove, we have no jurisdiction to review them in an interlocutory appeal of a denial of a summary-judgment motion based on qualified immunity.

*Miller v. Schoenen*, 75 F.3d 1305, 1309 (8th Cir. 1996).

Accordingly, it is clear that we lack jurisdiction to review Appellants' first two arguments. They relate to the issues of damages and causation, and, therefore, they are unreviewable in this interlocutory appeal. *See id.*

In Appellants' third argument, they contend that it is clearly established that they are entitled to qualified immunity because they complied with the standard of medical care in treating Pool. Initially, this argument appears reviewable because we have jurisdiction over disputes concerning the clearly established law at the time of Pool's miscarriage. *See Meloy*, 302 F.3d at 848-49; *Moore*, 255 F.3d at 545. However, we conclude that this argument also is unreviewable because it is analogous to the one we dismissed for lack of jurisdiction in *Moore*.

In *Moore*, an inmate brought a § 1983 claim against a prison doctor, alleging that the doctor was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court denied the doctor's motion for summary judgment based on qualified immunity, concluding that the parties' conflicting expert

opinions regarding the treatment rendered by the doctor created a material question of fact with respect to whether the doctor acted with deliberate indifference to the inmate's medical needs.

The doctor appealed, claiming that although he knew of the inmate's serious medical needs, he was not deliberately indifferent to those needs. The Court dismissed the interlocutory appeal for lack of jurisdiction because the doctor was not challenging whether the deliberate indifference standard at issue was clearly established. Rather, the Court explained that the doctor sought "to challenge only the district court's determination that . . . the pre-trial record sets forth a genuine issue of fact for trial," and therefore, the Court lacked jurisdiction to hear the appeal. *Moore*, 255 F.3d at 545 (internal quotation omitted).

As in *Moore*, Appellants' argument regarding the standard of care essentially challenges the district court's rejection of Dr. Hillis's affidavit and its conclusion that "there are clearly genuine issues of material fact as to whether one or more of the defendants exhibited deliberate indifference to Pool's serious medical needs." As the district court explained: "Dr. Hillis' affidavit does not indicate that he was aware of the fact that Pool had been bleeding vaginally since May 8, 2001. Nor does he provide an opinion on whether the bleeding could have been stopped had Pool received medical attention between May 8th and May 13th." *Pool*, No. 03-2112, slip op. at 16. The district court also concludes that Dr. Hillis's "affidavit does not appear to address the situation as it existed between May 8th and Pool's miscarriage." *Id.* at 21. In their briefing of this appeal, Appellants challenge these findings, arguing that based on Dr. Hillis's affidavit, the standard of medical care in this case is undisputed. Based on our precedent in *Moore*, we will not review the district court's determination of evidentiary sufficiency.

Appellants' final argument is that Pool failed to prove that she was suffering from a serious medical need that created an excessive risk to her health or safety or

that Appellants actually knew of the excessive risk. Although we lack jurisdiction over most of the issues raised by Appellants, this final argument is subject to our review because it requires us to resolve an "abstract issue of law" relating to qualified immunity, *see Moore*, 255 F.3d at 545, and because we may review what was known to Appellants in order to determine if the known facts would inform a reasonable actor that his actions violate an established legal standard, *see Miller*, 75 F.3d at 1308-09.

Appellants contend that Pool has failed to show that *her* health was exposed to an excessive risk, as opposed to the health of her unborn child. They also contend that she has failed to show that they actually knew of an excessive risk to her health because she was not "showing" at the time and was only "experiencing minimal feminine bleeding." Appellants' argument fails because it ignores facts in the record and relies on an incorrect understanding of the legal standard governing this case.

At this stage, "we must take as true those facts asserted by plaintiff that are properly supported in the record." *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001). In addition, Pool simply must prove that she suffered from an objectively serious medical need and that Appellants knew of the need yet deliberately disregarded it. *Jolly*, 205 F.3d at 1096. A serious medical need is "one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1992); *see also Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995) (noting that a serious medical need is one that is either obvious to layperson or supported by medical evidence).

Although Pool may not have been "showing," Pool informed prison officials that she was pregnant, bleeding and passing blood clots. The record also shows that Pool was in extreme pain from the cramping, so much so that it affected her ability to perform routine daily functions such as eating and showering. These facts, along with those detailed above, "constituted a need for medical attention that would have

been obvious to a layperson, making submission of verifying medical evidence unnecessary." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004). Based on the facts presented on summary judgment, we cannot say that as a matter of law Appellants were not deliberately indifferent in responding to Pool's miscarriage.

## III. CONCLUSION

For the reasons discussed above, we dismiss Appellants' first three arguments for lack of jurisdiction. However, regarding Appellants' fourth argument, we affirm the district court's denial of their motion for summary judgment based on qualified immunity.

_____